IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: CCX, INC., | )   Chapter 11 |
| | )   Case No. 22-10252 (JTD) |
| Debtor. | )   (Subchapter V) |
| | ) |
| _____ | ) |
| | ) |
| UNITED STEEL, PAPER AND FORESTRY, | ) |
| RUBBER, MANUFACTURING, ENERGY ALLIED | ) |
| INDUSTRIAL AND SERVICE WORKERS | ) |
| INTERNATIONAL UNION, AFL-CIO, CLC, | ) |
| | ) |
| Appellant, | )   Civ. No. 22-1563 (GBW) |
| | ) |
| v. | ) |
| | ) |
| BRAEBURN ALLOY STEEL LLC, | ) |
| | ) |
| Appellee. | ) |

**OPINION**

Susan E. Kaufman, LAW OFFICE OF SUSAN E. KAUFMAN, LLC, Wilmington, DE; Nathan Kilbert, Assistant General Counsel, UNITED STEELWORKERS, Pittsburgh, PA; Richard M. Seltzer, Melissa S. Woods, Sommer Omar, COHEN, WEISS AND SIMON LLP, New York, NY—Counsel to Appellant.

B. Nelson Sproat, BLANK ROME LLP, Wilmington, DE; Andrew Herman, John Lucian, BLANK ROME LLP, Philadelphia, PA—Counsel to Appellee.

September 18, 2023
Wilmington, Delaware

**WILLIAMS, U.S. DISTRICT JUDGE:**

This dispute arises in the chapter 11 case of debtor CCX, Inc. ("CCX" or "Debtor") and

in connection with appellee Braeburn Alloy Steel LLC's ("Braeburn") purchase of CCX's

business pursuant to 11 U.S.C. § 363(f) "free and clear of all liens, claims, rights, encumbrances,

and other interests … including, … rights or claims based on successor or transferee liability."

(B.D.I. 124[1] ("Sale Order") at 1-2).  Braeburn declined to assume, and CCX rejected, the

collective bargaining agreement ("CBA") covering substantially all of the hourly production and

maintenance employees of CCX's steel factory.  Braeburn hired essentially all of CCX's Union-

represented employees under new terms of employment and continued the same business.  The

United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union, AFL-CIO/CLC (the "Union"), which represented CCX's

employees, took the position that, as a "perfectly clear" successor to CCX under the National

Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, Braeburn was obligated to bargain with

the Union regarding new terms and conditions of employment.  Braeburn refused, and the Union

sought relief from the National Labor Relations Board ("NLRB"), which issued a complaint

against Braeburn.

Braeburn moved the Bankruptcy Court for an order enforcing the Sale Order and enjoining

the Union from pursuing relief from the NLRB based on the "free and clear" provision.  Following

a hearing, the Bankruptcy Court issued a bench ruling (B.D.I. 275 at 38:5-44:24) ("Bench Ruling")

and accompanying order (B.D.I. 280 ("Enforcement Order")), granting Braeburn's motion, finding

---

[1]     The docket of the Chapter 11 case, captioned *In re CCX, Inc.*, No. 20-10252 (JTD) (Bankr.
D. Del.), is cited herein as "B.D.I. __." The appendix attached to the Union's opening brief
(D.I. 13-1) is cited herein as "A__." The appendix attached to Braeburn's answering brief
(D.I. 14-1) contains 16 exhibits, but because it is not separately paginated, it must be cited
herein only by exhibit no. as "App'x __."

that "The Sale Order imposes an injunction on the Union and enjoins it ... from making a complaint with the National Labor Relations Board about whether the CBA is still in effect or whether Braeburn is obligated to negotiate and recognize the Union under terms and conditions of the CBA," and enjoining the Union "from asserting, pursuing or otherwise taking any action, directly or indirectly, with respect to any allegation that Braeburn is bound to (1) the CBA or (2) the terms and conditions of the CBA by operation of law ..." (*Id.* at 2-3). The Union seeks reversal of the Enforcement Order to the extent that it enjoins the Union from seeking relief under the NLRA based on Braeburn's post-sale conduct. The Union asserts that its federal labor law claim is based on a statutory obligation arising solely from Braeburn's post-sale decisions and actions, that it exists independently of the CBA, that its determination falls within the exclusive jurisdiction of the NLRB, and that such an obligation was not an "interest in [] property" extinguished by virtue of the § 363(f) sale. For the reasons set forth herein, the Court will grant the Union its requested relief from the Enforcement Order.

## I.   **BACKGROUND**

### A.   **The Chapter 11 Case and Asset Sale**

CCX was a specialty steel manufacturer that operated a factory in Lower Burrell, Pennsylvania, where it employed hourly production and maintenance workers represented by the Union. (A489). CCX and the Union were parties to a CBA setting forth the terms and conditions of employment for those Union-represented workers. (A490-491). CCX filed a bankruptcy petition on March 27, 2022. (A001). On April 21, 2022, the Bankruptcy Court entered a bidding procedures order providing for Braeburn to serve as a stalking horse bidder in a proposed sale of substantially all of CCX's assets (A054-A092). In connection with the sale, the Union requested to be, and was in fact, a consultation party. (A060 ¶ 6 ("The Debtor shall send written notice of the date, time, and place of the Auction to the Qualified Bidders, the Union and

2

creditors, no later than two business days before such Auction.")  During the negotiation of the

asset purchase agreement ("APA") and the contract assumption and assignment process that

followed entry of the bid procedures order, Braeburn declined to assume the CBA.  In a sale

hearing held on May 9, 2022 (*see* A215-A231), the Union expressed its hope that Braeburn

would offer jobs to CCX's employees, and it did not object to the proposed sale to Braeburn.

(*see* A227-A228, Sale Hearing Tr. at 13:12-14:3).  Following the hearing, the Bankruptcy Court

approved the proposed sale to Braeburn.  (A093).  The Sale Order, which approved the APA,

provided that Braeburn would acquire substantially all of CCX's assets "free and clear of all

liens, claims, rights, encumbrances, and other interests of any kind or nature whatsoever ... and

any rights or claims based on any taxes or successor or transferee liability."  (A111).  The APA

did not obligate Braeburn to hire any of CCX's employees.  (A157).  The Sale Order included a

statement that:

> Other than as expressly set forth in the APA, none of the Buyer, its present or
> contemplated members, partners, officers, directors or shareholders, its successors or
> permitted assigns, or any of the foregoing's respective affiliates, agents, officials,
> personnel, representatives, or advisors, shall have any liability for any claim assertable
> against the Debtor, or its estate, or related to the Purchased Assets. The Buyer shall not
> be deemed, as a result of any action taken in connection with the APA or any of the
> transactions or documents ancillary thereto or contemplated thereby, or in connection
> with the transfer of the Purchased Assets, (a) to be a legal successor, or otherwise be
> deemed a successor to the Debtor, (b) to have, *de facto* or otherwise, merged with or into
> the Debtor, or (c) to be a mere continuation or substantial continuation of the Debtor or
> the enterprise of the Debtor. Without limiting the foregoing, the Buyer shall not have any
> successor, transferee, derivative, or vicarious liabilities of any kind or character for any
> claims, including, without limitation, under any theory of successor or transferee liability,
> *de facto* merger or continuity, environmental, tax, labor and employment, products, or
> antitrust liability, whether known or unknown as of the Closing Date, now existing or
> hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

(A118).  The Sale Order further enjoined all persons "holding liens, claims, encumbrances, and/or

other interests of any kind or nature whatsoever . . . against or in the Seller or the Purchased Assets"

from asserting those claims, "and any rights or claims based on any taxes or successor or transferee

liability" against the Buyer. (A111-112).  As contemplated by the APA, Braeburn provided offer letters, dated May 19, 2022, to substantially all of CCX's former employees for the business.  (*See e.g.*, App'x 4).  The sale of CCX's assets closed on May 27, 2022.  Braeburn hired essentially all of CCX's former employees, under new terms and conditions of employment, including new terms related to wages and benefits, and began to operate the business.  (A233; A274-275).

Separately, on June 27, 2022, CCX filed a motion in the Bankruptcy Court to reject its CBA with the Union, pursuant to 11 U.S.C. § 1113.  (A232).  On August 15, 2022, the Union and CCX filed with the Bankruptcy Court a stipulation reflecting their agreement to terminate the CBA and to resolve various claims arising under the CBA prior to the May 27, 2022 closing of the sale to Braeburn.  (A254).  This stipulation made clear that it did not impact any claims by the Union against Braeburn, stating it "shall only address and resolve disputes involving the Debtor [CCX] and the Union and Union Retirees."  (A258).

**B.    Dispute Regarding Successorship Bargaining Obligations**

On May 27, 2022, the same day the sale closed, the Union requested that Braeburn, as a "perfectly clear" successor employer under the NLRA, recognize the Union as the collective bargaining representative of its hourly production and maintenance employees.  (A490). Braeburn refused to do so.  (*Id.*)

The NLRB has set forth principles to define when an entity taking over an existing business is a successor employer obligated to recognize and bargain with the union representing the predecessor's employees.  Under the NLRA, a new employer continuing the "employing industry" and employing a majority of its employees from the workforce of the predecessor employer is a "successor" bound to recognize and bargain with the union representing those employees.  *In re Northwest Glove Co.*, 74 NLRB 1697, 1699-1701 (1947); *see also*, *e.g.*, *NLRB v. Lunder Shoe Corp.*, 211 F.2d 284, 286-87 (1st Cir. 1954); *Johnson Ready Mix Co.*, 142 NLRB

437, 441-42 (1963). The Supreme Court approved this approach. *See NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 280-81 (1972). The successorship doctrine applies when the successor employer has purchased the assets of the predecessor, including through a sale supervised by a bankruptcy court. *See Nephi Rubber Prods. Corp. v. NLRB*, 976 F.2d 1361, 1366 (10th Cir. 1992).

Under the NLRB's approach to successorship, if a majority of the employees of the new employer are not drawn from the union-represented ranks of the old employer, the new employer is not a "successor" and has no obligation to bargain with the union. *See Burns*, 406 U.S at 280. Similarly, if there is not "substantial continuity in the employing enterprise," the new employer is not a successor and is not obligated to bargain with the union. *Aircraft Magnesium*, 265 NLRB 1344, 1345 (1982), *enf'd* 730 F.2d 767 (9th Cir. 1984); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987). In evaluating "substantial continuity," the NLRB examines a number of factors, including: the whether the business of both employers is essentially the same, including the production processes used, the products manufactured, and the customer base; "whether the employees of the new company are doing the same jobs in the same working conditions, under the same supervisors;" and any hiatus between the two operations. *Fall River Dyeing*, 482 U.S. at 43, 45; *Aircraft Magnesium*, 265 NLRB at 1345.

An employer that takes over the operation of a predecessor where employees were represented by a union therefore may avoid becoming a successor in the NLRB's eyes by hiring less than a majority of its workforce from the union represented ranks of the predecessor, by making significant changes in its operation, or by doing both of those things. As the Supreme Court observed:

> Thus, to a substantial extent the applicability of *Burns* rests in the hands of the successor. If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor,

> then the bargaining obligation of [29 U.S.C. § 158(a)(5)] is activated. This makes sense when one considers that the employer *intends* to take advantage of the trained work force of its predecessor.

*Fall River Dyeing*, 482 U.S. at 40-41.

Generally, a successor may set initial terms and conditions of employment (*e.g.*, wages and benefits) without bargaining with the union that represented the employees of its predecessor. *Burns*, 406 U.S. at 294. In specific circumstances, the Supreme Court has observed that "there will be instances in which it is perfectly clear that the new employer plans to retain all employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." *Id.* at 294-95. When it is "perfectly clear" that a successor will be retaining the existing employees, the successor employer may either bargain with the union regarding new terms and conditions of employment, or it may utilize the terms and conditions of employment prevailing under the predecessor. Importantly, in order to be a "perfectly clear" successor, which is thus obligated to bargain with the union before changing the terms and conditions of employment, the employer must first satisfy the basic predicates necessary to be a successor obligated to recognize and bargain with the union at all. *See Galloway School Lines, Inc.*, 321 NLRB 1422, 1426-27 (1996), *overruled on other grounds by Ridgewood Health Care Ctr., Inc*., 367 NLRB No. 110 (Apr. 2, 2019) (holding that the predecessor's employees must constitute a majority of the successor's workforce for the employer to be a "perfectly clear" successor).

In absence of recognition by Braeburn, the Union pursued relief with the NLRB. On October 14, 2022, the NLRB issued a Consolidated Complaint against Braeburn (App'x 5) which alleged that Braeburn had (1) failed to recognize and bargain with the Union and (2) made unlawful unilateral changes from the terms and conditions of employment that had prevailed under the Union's CBA with CCX. (A488). The second allegation was premised on the

6

NLRB's conclusion that Braeburn was a "perfectly clear" successor. Neither the Union nor the NLRB alleged that Braeburn was or could be bound to the CBA.

**C.    Braeburn's Motion to Enjoin the Union from Pursuing Relief under the NLRA**

On October 5, 2022, prior to the NLRB's issuance of the Consolidated Complaint, Braeburn filed its *Motion for Entry of an Order Clarifying and Enforcing the Sale Order* with the Bankruptcy Court. (A268). Braeburn asked the Bankruptcy Court to enjoin the Union from pursuing any legal claim that Braeburn had any obligation to recognize or bargain with the Union arising from the Union's past relationship with CCX. (*Id.*) The Union filed an Objection, pointing out that both the NLRB and the courts have found that a bankruptcy court may not insulate purchasers from bargaining obligations based on the purchaser's post-closing conduct. (A423). The NLRB filed an Objection making the same argument. (A478).

**D.    The Bench Ruling, the Enforcement Order, and the Appeal**

Following a hearing on November 15, 2022, the Bankruptcy Court issued a Bench Ruling. Among other things, the Bench Ruling noted that the motion presented a "question of first impression in this circuit" and posed a "conflict between two different areas of law: the Bankruptcy Code and the National Labor Relations Act." (Bench Ruling at 38:7-10). The Bankruptcy Court noted that the Sale Order provided that Braeburn would not be deemed a successor to CCX, and it further found that Braeburn would not have purchased the assets of CCX if the CBA were to be assumed with those assets. (*Id.* at 38:12-16). The Bankruptcy Court concluded that the CBA was an interest in property (*see id.* at 40:16-42:8), that the Debtor's assets could be sold free and clear of such an interest pursuant to § 363(f), and that the Union consented to the sale free and clear of the CBA by virtue of its participation in the sale hearing and its failure to raise an objection (*see id.* at 43:7-43:15).

In further support of this ruling the Bankruptcy Court explained that because a Debtor may in certain circumstances reject a CBA under § 1113 of the Bankruptcy Code in order to effectuate its ability to reorganize, and because it would be inconsistent with congressional intent to later hold the reorganized debtor to the terms of its rejected CBA under a successor theory, "the same holds true if the reorganization occurs in the context of a sale of the debtor's assets….". (*See id.* at 43:16-44:1). Thus, the Bankruptcy Court concluded, it would be inconsistent with congressional intent to hold that an employer could not purchase a debtor's assets and retain its employees without incurring the obligation to recognize and negotiate with the union (during which time it would be bound by the terms of a preexisting CBA). (*See id.* at 44:7-13). On November 18, 2022, the Bankruptcy Court issued the Enforcement Order, providing, in relevant part:

> 1. The Union is barred and prohibited (a) from asserting, pursuing or otherwise taking any action, directly or indirectly, with respect to any allegation that Braeburn is bound to (1) the CBA or (2) the terms and conditions of the CBA by operation of law; and (b) from taking any action, directly or indirectly, to challenge, nullify, circumvent or otherwise modify the Sale Order and the effect of the injunction granted to Braeburn in the Sale Order.

> 2. The Union shall immediately cease and desist and is enjoined from (a) pursuing, asserting, or prosecuting any claims against Braeburn on the basis that it is a bound to (1) the CBA or (2) the terms and conditions of the CBA by operation of law in connection with the charges filed with the National Labor Relations Board or otherwise; and (b) asserting any additional claims, causes of action or demands, directly or indirectly, against Braeburn that relate to, arise from or concern Braeburn being deemed bound to (1) the CBA or (2) the terms and conditions of the CBA by operation of law.

(A587). On December 1, 2022, the Union filed its Notice of Appeal from the Enforcement Order. (D.I. 1). The appeal is fully briefed. (D.I. 13, 14, 16). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## E.    Subsequent Events

Neither the Sale Order nor the Enforcement Order prevented the process for employees to organize and elect a union as their bargaining representative. On January 19, 2023, the Union filed a petition with the NLRB seeking to represent all of the hourly production and maintenance employees. (App'x 11). As part of the election process, on February 1, 2023, Braeburn filed a Statement of Position, indicating there was no "bar to conducting an election." (*See* App'x 12). On February 6, 2023, the Union and Braeburn entered into a Stipulated Election Agreement for an election for a bargaining unit including all hourly production and maintenance employees at the Lower Burrell, Pennsylvania facility and excluding all other employees, foremen, office clerical, confidential employees, guards, professional employees and supervisors as defined in the Act ("Bargaining Unit"). (*See* App'x 13). On February 23, 2023, an election was conducted by the NLRB, and a majority of employee ballots were cast for the Union. (App'x 14). On March 3, 2023, the Union was certified as the exclusive collective-bargaining representative for the Bargaining Unit employees. Braeburn subsequently engaged in negotiations with the Union for a collective bargaining agreement.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1). A bankruptcy court's interpretation of its own order is given greater discretion by a reviewing court and is subject to review under an abuse of discretion standard, except if the issue being reviewed presents only a question of law. *In re Shegango Group Inc.*, 501 F.3d 338, 346 (3d Cir. 2007); *see also Spitfire Energy Grp., LLC v. Petro. LLC (In re TE Holdcorp, LLC)*, 2022 WL 951553, at *5 (D. Del. Mar. 30, 2022) (while "[a] bankruptcy court's interpretation of its own orders is ... reviewed under an abuse of discretion standard," "[a]ny legal conclusions, including jurisdictional findings ... are subject to *de novo* review).

## III.   ANALYSIS

### A.   Mootness

As an initial matter, Braeburn argues that the Union's request for relief is constitutionally moot and that it is also statutorily moot pursuant to 11 U.S.C. § 363(m).

#### 1.   The Appeal Is Not Constitutionally Moot

With respect to constitutional mootness, Braeburn argues that the Union's appeal no longer presents a live controversy.  It is axiomatic that Article III of the United States Constitution does not permit federal courts to decide moot cases.  *Rosetti v. Shalala*, 12 F.3d 1216, 1223 (3d Cir. 1993).  Article III of the Constitution gives federal courts jurisdiction only over "Cases" and "Controversies."  U.S. Const., art. III, § 2.  "The mootness doctrine imposes two requirements: (1) that the underlying dispute presents 'live' issues, and (2) that the parties have 'a legally cognizable interest in the outcome'—that is, a personal stake in the dispute."  *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016) (citing *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).  According to Braeburn, the main issue in the NLRB action is that Braeburn, as successor to CCX, had an obligation to recognize and bargain with the Union.  (*See* D.I. 14 at 17-18).  Because Braeburn, at the time of the appeal, was already actively negotiating a collective bargaining agreement with the Union, the appeal presents no live issue, Braeburn argues, and the Union no longer has any stake in the outcome.  (*See id.*)

However, as the Union correctly points out, Braeburn simultaneously argues that the Union is in ongoing violation of the Bankruptcy Court's Enforcement Order.  (*See id.* at 13-14 & 42).  If, as Braeburn alleges, the Enforcement Order presently constrains the Union's behavior in pressing forward with unfair labor practice charges against Braeburn based on Braeburn's actions post-sale but prior to the NLRB election that took place on February 23, 2023, the Court

agrees with the Union that controversy over the Enforcement Order remains sufficiently "live" so as to permit this Court to reach the merits of the issue.

### 2.   The Appeal Is Not Statutorily Moot

Braeburn further argues that the appeal is moot under § 363(m) of the Bankruptcy Code. (*See* D.I. 14 at 18). Section 363(m) moots an appeal of a bankruptcy court sale order if two conditions are met:[2] "(1) the underlying sale or lease was not stayed pending the appeal, and (2) the court, if reversing or modifying the authorization to sell or lease, would be affecting the validity of such a sale or lease." *Schepis v. Burtch (In re Pursuit Cap. Mgmt., LLC)*, 874 F.3d 124, 135 (3d Cir. 2017) (quoting *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 499 (3d Cir. 1998)). In determining whether an appeal would affect the validity of a bankruptcy sale, the "ultimate question is whether the grant of relief," requested on appeal, "would, in effect, 'claw back the sale,'" from the purchaser. *In re Energy Future Holdings Corp.*, 949 F.3d 806, 821 (3d Cir. 2020) (quoting *In re ICL Holding Co.*, 802 F.3d 547, 554 (3d Cir. 2015)); *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d at 139 ("In our assessment of whether a challenge affects the validity of a sale, we must look to the remedies requested by the appellants") (internal citations and quotations omitted). The Third Circuit has rejected arguments asserting that § 363(m) applies to every challenge of a sale order; rather, § 363(m) "stamps out only those challenges that would *claw back the sale* from a good-faith purchaser." *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d at 140 (emphasis added) (quoting *ICL Holding*, 802 F.3d at 554). Section 363(m) does not moot "every term that might be included in a sale

---

[2]   *See id.* at 135 n.17 (noting the Third Circuit's test under § 363(m) "is a minority position," where a majority of circuit courts "have adopted a 'per se' rule that moots a challenge to a sale under § 363(m) automatically when a stay is not obtained").

11

agreement, even if each is technically integral to that transaction." *ICL Holding,* 802 F.3d at 554 (internal quotes omitted).

As to the relief requested in this appeal, the Union seeks to vacate the Bankruptcy Court's Enforcement Order to the extent that it enjoins the Union from seeking relief under the NLRA based on Braeburn's post-sale conduct. (*See* D.I. 13 at 34; D.I. 16 at 4). Braeburn's post-sale conduct does not implicate the terms of the sale itself. (*See* D.I. 13 at 19-29). The appeal in no way involves reversing the sale of CCX's assets nor would it otherwise affect the validity of such a sale. Similarly, there is no request for relief that would in any way "claw back" the sale of Debtor's assets to Braeburn.

According to Braeburn, allowing the Union to pursue relief under the NLRA would affect the validity of the sale because Braeburn would not have purchased CCX if the Bankruptcy Court did not extinguish its successor bargaining obligations. (*See* D.I. 14 at 19). As the Union points out, however, Braeburn's assertion mischaracterizes the factual chronology surrounding the sale and misinterprets how federal labor law applies to the instant case. (*See* D.I. 16 at 5). The sale of CCX's assets to Braeburn closed on May 27, 2022. (A274). Neither the Sale Order nor the APA mandated that Braeburn hire essentially all of CCX's employees. (*See* A109; A111; A157). However, after the sale closed, Braeburn voluntarily hired essentially all of CCX's former employees, under new terms and conditions of employment, and made certain operational decisions in managing the business; these post-sale actions triggered successor liability under federal labor law. (A233; A274-275). Braeburn cannot insist that a labor law claim, which arose *after* the sale closed as a result of its own conduct, affected its deliberation about whether to buy CCX *before* the sale closed. Braeburn's *post hoc* reasoning does not provide a basis to apply § 363(m).

Indeed, Braeburn fails to cite any case holding that § 363(m) moots an appeal challenging the Bankruptcy Court's exercise of jurisdiction over a buyer's liability based on its post-sale conduct. As the Union points out, in each of the cases relied upon by Braeburn where § 363(m) was found applicable, the respective appellant contested the validity of an underlying plan of reorganization and/or sale of debtor's assets.[3] Unlike the appellants in those cases, the Union is not contesting any provision or aspect of the Sale Order allowing Braeburn's purchase of CCX's assets. Nor would granting the relief that the Union requests on appeal impose any material change on Braeburn's asserted ownership of Debtor's assets or otherwise affect the integrity of the sale of assets. In sum, the Union is not seeking to reverse or modify the sale itself, only to assert its rights based on Braeburn's post-sale conduct. Section 363(m) is inapplicable.

## B. The Determination of Successorship Obligations Under the NLRA Is Based on Post-Sale Conduct and Is Committed to the NLRB

The NLRA, guaranteeing the rights of workers to organize, bargain collectively, and to strike, is codified at 29 U.S.C. §§ 151-169. The NLRA was enacted for the purpose of "encouraging the practice and procedure of collective bargaining," recognizing that this procedure safeguards the flow of commerce by "restoring equality of bargaining power between employers and employees." 29 U.S.C. § 151. It protects the rights of employees to join unions

---

[3]     *See In re Energy Future Holdings Corp.,* 949 F.3d at 821 (appeal moot where appellant contests the terms of debtor's reorganization plan); *In re Pursuit Capital Mgmt., LLC*, 874 F.3d at 140-41 (appeal moot because relief sought required conclusion that the Bankruptcy Court erred in applying auction procedures and certain assets should not have been sold to purchaser); *Krebs Chrysler-Plymouth*, 141 F.3d at 499-500 (appeal moot because relief sought required altering the terms of the sale and a refunding of a portion of its purchase price); *Pittsburgh Food & Beverage, Inc. v. Ranallo,* 112 F.3d 645, 650 (3d Cir. 1997) (appeal moot because the relief sought would "demonstrate that the sale was flawed"); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers & its Local 982 v. Morse Tool, Inc.*, 85 B.R. 666, 668 (D. Mass 1988) (appeal moot "in the absence of an effective stay order" under per se rule and where requested relief would require part of the sale order to be set aside).

13

and to act in concert to improve their wages and working conditions. 29 U.S.C. § 157. The NLRA also identifies certain unfair labor practices, including an employer's refusal to bargain collectively with the union representing its employees. 29 U.S.C. § 158(a)(5). As part of the employer's obligation to bargain with such a union, the employer is generally obligated by the NLRA to refrain from making changes to those employees' terms and conditions of employment (*e.g.*, wages, hours, and working conditions) without the union's consent. *See NLRB v. Katz*, 369 U.S. 736, 743 (1962) (holding that "an employer's unilateral change in conditions of employment … is a circumvention of the duty to negotiate").

To remedy unfair labor practices, the NLRA created the NLRB, a five-member board, which is "empowered … to prevent any person from engaging in any unfair labor practice," 29 U.S.C. § 160, which includes an employer's "refus[al] to bargain collectively with the representatives of his employees," 29 U.S.C. § 158(a)(5). "Congress has made the Board the only entity entitled to enforce the Act." *Nathanson v. NLRB*, 344 U.S. 25, 27 (1952); *see San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245 (1959) ("When an activity is arguably subject to [the NLRA], the states as well as the federal courts must defer to the exclusive competence of the [NLRB] … "). The Supreme Court has explicitly stated that bankruptcy courts must permit the NLRB to resolve unfair labor practices. *Nathanson,* 344 U.S. at 30 ("It is the Board, not the referee in bankruptcy nor the court, that has been entrusted by Congress with authority to determine what measures will remedy the unfair labor practices.").

Federal courts have held that determinations of successorship obligations under federal labor law are committed to the NLRB. *See Erica, Inc. v. NLRB,* 200 Fed. App. 344, 347 (5th Cir. Sep. 19, 2006) ("Bankruptcy courts lack jurisdiction to determine successorship obligations under federal labor law."; *In re Carib-Inn of San Juan Corp,* 905 F.2d 561, 563-64 (1st Cir. 1990) (rejecting successor's argument that bankruptcy court should adjudicate unfair labor

14

practice proceedings against it); *In re Bel Air Chateau Hospital, Inc.*, 611 F.2d 1248, 1251 (9th Cir. 1979) ("whether a new employer is an 'alter ego' or a 'successor' to an earlier employer is a question of substantive federal labor law, the resolution of which is committed to the [NLRB] and the courts that review its determinations."); *In re Pan Am. Hosp. Corp.*, 364 B.R. 832, 837 (Bankr. S.D. Fla. 2007) ("[T]he NLRB has complete and total independent jurisdiction in the area of labor relations relative to the activities of the purchaser of a business or property in bankruptcy from the date of acquisition of such business forward").

For example, in *Goodman*, the Second Circuit held that the bankruptcy court lacked jurisdiction to resolve the question of successorship under the NLRA. *NLRB v. Goodman (In re Goodman)*, 873 F. 2d 598, 604 (2d Cir. 1989), *overruled on other grounds, Germain v. Connecticut Nat'l Bank,* 926 F. 2d 191 (2d Cir. 1991). The Second Circuit stated

> The NLRB has primary jurisdiction over activity that is arguably subject to Sections 7 and 8 of the NLRA. Federal courts must defer to the exclusive competence of the [NLRB] to adjudicate such claims. Whether a new employer is an alter ego of, or a successor to, an earlier employer for purposes of liability under the NLRA is a question of substantive federal labor law. The [NLRB] has expertise in adjudicating successorship issues, and there is an interest in having uniform determinations by a single agency. Thus, the question of successorship normally falls within the [NLRB]'s primary jurisdiction.

*Goodman*, 873 F.2d at 602-03 (citations omitted). The Fifth Circuit went on to observe that although the bankruptcy court possessed jurisdiction to determine the scope of the debtor's discharge, that discharge could not shield the debtor from liability for his post-petition conduct rendering him a successor. *Id.* at 603.

Braeburn argues that the *Erica*, *Goodman*, and *Carib-Inn* decisions stand only for "the proposition that post-sale conduct by a purchaser is subject to the NLRB's jurisdiction," which, Braeburn asserts, "is not the issue here." (D.I. 14 at 31). According to Braeburn, the Union's argument, that the "Enforcement Order improperly determined whether [Braeburn] could be a

'successor' for purposes of the [NLRA]," is "disingenuous[]" and "mischaracterizes the Enforcement Order." (*See id.*) The Court disagrees. The crux of the Union's argument is not that the Enforcement Order improperly determined Braeburn's statutory successorship obligations, but rather that it improperly enjoins the Union from seeking a determination with respect thereto. As any such determination turns on Braeburn's post-sale conduct, the decisions cited by the Union are instructive.

## C.   The Enforcement Order Improperly Enjoins the Union from Seeking Relief Under the NLRA Based on Braeburn's Post-Sale Conduct

Faced with competing statutory schemes, the Bankruptcy Court reasoned that under § 363(f) of the Bankruptcy Code, a debtor's asset may be sold free and clear of any "interest in [ ] property," which, in the Bankruptcy Court's view, included the CBA; it further reasoned that NLRA obligations related to the CBA, such as maintaining the existing terms and conditions of employment, were also "interest[s] in [] property" extinguished under § 363(f). Finally, the Bankruptcy Court found that the Union had consented to the sale free and clear of those interests. In this Court's view, the Bankruptcy Court's analysis, which focused on the CBA and whether it was an "interest in [] property" subject to § 363(f), failed to appreciate that Braeburn's status as a successor is not dictated by the CBA but rather determined under federal labor law based on its post-sale conduct, and that any statutory obligation to bargain with the Union before altering terms and conditions of employment was not an "interest in [] property" that could be extinguished.

### 1.   The Bargaining Obligation Exists Independently of the CBA

First, Braeburn's statutory obligation to bargain with the Union before modifying the prevailing terms and conditions of employment is an imperative under federal labor law based on Braeburn's post-sale conduct; it exists independent of the CBA. Neither the Union nor the

NLRB alleged that Braeburn was or could be bound to the CBA. Rather, the NLRB's Consolidated Complaint alleged that Braeburn had made changes to the terms and conditions that had prevailed under the CBA without bargaining with the Union as required under the NLRA. (A488). While the NLRB may look to a CBA to ascertain the prevailing terms and conditions of employment that a successor employer may be obligated, as a matter of law, to maintain as a result of its post-closing conduct, the CBA between a union and predecessor employer cannot dictate *whether* the buyer is obligated to maintain those conditions; only the successor employer's post-closing conduct will establish the extent of its labor law obligations.

## 2.   NLRA's Statutory Bargaining Obligation Is Not an "Interest in [] Property"

Second, whether the CBA is an "interest in [] property" subject to § 363(f) is irrelevant to a determination of whether the NLRB could assess violations of the NLRA based on Braeburn's post-sale conduct. As the Union correctly points out, Braeburn did not plead that the CBA was an interest in property. (A268; A450; A505). The Union and the NLRB similarly made no mention of whether the CBA constituted an interest in property. (A423; A478). Rather, Braeburn argued that its "bargaining obligation" as a successor is an "interest in [] property" subject to § 363(f). (A507). But the successor bargaining obligation at issue here, which Braeburn argued is an "interest in [] property," did not arise from the property being sold and therefore cannot be deemed an "interest in [] property" subject to § 363(f). The term "interest in [] property" in property, as used in § 363(f) "is not defined anywhere in the Bankruptcy Code." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000); 11 U.S.C. § 363(f) (permitting, under certain conditions, debtor's sale of property "free and clear of any interest in such property"). However, in *In re Trans World Airlines*, the Third Circuit held that the term "any interest" under § 363(f) "is intended to refer to obligations that are connected to, or arise from, the property being sold." *In re Trans World Airlines, Inc.,* 322 F.3d 283, 289

17

(3d Cir. 2003). Therefore, to determine whether a buyer's obligations as a "perfectly clear" successor qualify as an "interest in property," courts must assess whether such obligations are connected to, or arise from, the transfer of such property.

But successorship obligations under the NLRA do not depend on the transfer or sale of property; rather, such obligations derive from a successor's conduct in hiring a majority of its workforce from the predecessor and maintaining substantial continuity in business operations. *See Fall River Dyeing*, 482 U.S. at 46. For instance, in *Burns*, the Supreme Court held that a company that replaced its predecessor in providing security services had to honor obligations as a successor employer even though "there was no [ ] sale of assets." *Burns*, 406 U.S. at 286. In *Waterbury Hotel*, the D.C. Circuit held that, consistent with "all of [its] sister circuits to have squarely considered the issue [ ] the acquisition of [ ] assets is not a prerequisite for successorship." *Waterbury Hotel Mgmt., LLC v. NLRB*, 314 F.3d 645, 654 (D.C. Cir. 2003).[4] As Braeburn's successor bargaining obligations, if any, do not arise from the transfer of property, and arise only from post-sale conduct, such obligations cannot be extinguished as an "interest in [] property" pursuant to a sale under § 363(f) of the Bankruptcy Code.

---

[4] *See also Saks & Co. v. NLRB*, 634 F.2d 681, 687 (2d Cir. 1980) ("a transfer of assets [ ] has not been thought to be a necessary condition" to determine successorship obligations); *NLRB v. Band-Age, Inc.*, 534 F.2d 1, 5 (1st Cir. 1976) (the fact that the transfer between the predecessor and successor did not take the form of "an outright sale is not of great significance for purposes of determining [successorship] rights and obligations under the Act"); *Tom-A-Hawk Transit, Inc. v. NLRB*, 419 F.2d 1025, 1027 (7th Cir. 1969) (new company that provided bus service was successor of old bus company notwithstanding absence of "transfer of assets" between old and new companies); *Maintenance, Inc.*, 148 NLRB. 1299, 1301 (1964) (successorship obligations do not "turn [] upon the acquisition of assets").

Braeburn cites several cases holding that certain claims constitute an "interest in []
property" subject to § 363(f), but those claims could be reduced to a monetary equivalent.⁵ A
collective bargaining obligation, which consists of recognizing and bargaining with the employee
representative and other non-monetary activities, has no monetary equivalent. *See In re Creative
Restaurant Mgmt., Inc.,* 141 B.R. 173, 178 (Bankr. W.D. Mo. 1992) (holding that a re-run union
election and other non-monetary obligations could not be blocked on the basis of a free and clear
sale: "If a re-run election were ordered, that in and of itself would not give rise to a right of
payment … the free and clear sale does not immunize the buyer from any responsibility to
conduct a re-run election" under the NLRA), *opinion vacated due to settlement between the
parties,* 150 B.R. 232 (Bankr. W.D. Mo. 1992); *see also In re Sugarloaf Holdings, LLC,* 640
B.R. 270, 282 (Bankr. D. Utah 2022) (holding that a § 363(f) free and clear sale could not sever a
non-monetary interest, which could not result in "a money judgment, an equitable remedy, or
any other relief that could be satisfied through the payment of money from the [debtor's] sale
proceeds").

---

⁵     *See In re PBBPC, Inc,* 484 B.R. at 869 ("transfer of an employer's contribution rate to a
successor asset purchaser" is an interest in property because it "is really an attempt to
recover the money that the predecessor employer would have paid if it had continued in
business"); *In re Chrysler LLC,* 576 F.3d at 125 n.18 (holding that § 363(f) extinguished
product liability "claims" defined as a "right to payment"); *In re Trans World Airlines,*
322 F.3d at 291 (employment discrimination claims against the debtor and travel
vouchers belonging to debtor employees were extinguished as interest in property
because they "can be reduced to a specific monetary value"); *United Mine Workers of
Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),*
99 F.3d 573, 585 (4th Cir. 1996) ("the Bankruptcy Court may extinguish Coal Act
successor liability pursuant to 11 U.S.C. § 363(f)(5)" where the claimants "could be
compelled [] to accept a money satisfaction of such interest"); *In re Old Carco LLC,* 538
B.R. 674, 687 (Bankr. S.D.N.Y. 2015) ("transfer of an employer's contribution rate to a
successor asset purchaser" is an extinguished interest in property because it is "an attempt
to recover the money that the predecessor employer would have paid") (internal citations
and quotations omitted).

Braeburn relies heavily on the *USA United Fleet* decision, in which the Eastern District

of New York held that a § 363(f) sale extinguished the New York State Department of Labor's

("NYSDOL") ability to impose successor liability under state law for unemployment insurance

purposes against the buyer. *In re USA United Fleet, Inc*., 496 B.R. 79 (Bankr. E.D.N.Y. 2013).

As the Union points out, *USA United Fleet* is distinguishable for several reasons. First, the court

reasoned that the § 363(f) sale extinguished such liability because NYSDOL either consented to

eradication of its claim or because its successor liability claim against the buyer could be reduced

to "a money satisfaction." *Id.* at 83 n.2. The Union's labor law claim here does not meet either

of those conditions. Second, *USA United Fleet* construed state law. Here, the Union's

representational rights arise under federal law, and given that the Bankruptcy Code and the

NLRA are "capable of coexistence," the court has a "duty [] to regard each as effective." *See*

*Simon v. FIA Card Servs., N.A*., 732 F.3d 259, 274-75 (3d Cir. 2013) (internal citations and

quotations omitted). Finally, Braeburns cites no Third Circuit case holding that a bankruptcy

court can extinguish a buyer's post-sale liability under federal law.

In sum, Braeburn has not cited, and the Court has not identified, any decision in any

jurisdiction holding or suggesting that a sale under § 363(f) may preclude statutory obligations

arising under the NLRA for post-sale conduct by a purchaser. The cases cited by Braeburn stand

for the proposition that § 363(f) extinguishes *pre-sale liability* against the *debtor*—facts far

different from those facing the Court—and they are not instructive here.[6]

---

[6] *See Mass. Dep't of Unemployment Assistance v. OPK Biotech, LLC (In re PBBPC, Inc.),*
484 B.R. 860, 869-70 (B.A.P. 1st Cir. 2013) (§ 363(f) extinguished application of debtor's
unemployment insurance contribution rate to the purchaser as its successor under state tax
law because it "is clearly intended to recover . . . sums that the *Debtor would have paid*
had it remained in business.") (emphasis added); *Ind. State Police Pension Tr. v. Chrysler
LLC (In re Chrysler LLC),* 576 F.3d 108, 123 (2d Cir. 2009) (§ 363(f) extinguished pre-
sale personal injury claims against purchaser "for product defects in vehicles produced by
[debtor]"), *vacated* 592 F.3d 370 (2d Cir. 2010); *In re Trans World Airlines*, 322 F.3d at

20

### 3.   Union Consent to Extinguishment of Successor Bargaining Obligations Is Not Supported

An entity's interest in property can only be extinguished if one of five conditions set forth

in § 363(f) has been met:

(1)    applicable non bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5).  The Bankruptcy Court held that conditions one, three, and four did

not apply, and the Union agrees.  (*See* Bench Ruling at 42:19-2).  The Bankruptcy Court

determined that it did not need to reach condition five—whether the Union could be compelled

to take money satisfaction of potential successor bargaining obligations—based on its separate

holding that condition two was met.  (*Id.* at 43:7-9)  The Bankruptcy Court reasoned that the

Union consented to the sale of CCX "free and clear of the union's interest in the CBA," and

successor bargaining obligations, because "the [U]nion was on notice of the sale," "participated

in the [sale] hearing without raising an objection," and because it had already "settled certain

disputes with [CCX] in connection with the rejection of the CBA." (*See id.*)

First, the Union could not have consented to the Sale Order's alleged extinguishment of

Braeburn's successor bargaining obligation as such obligations under federal labor law only arise

---

290-91 (§ 363(f) extinguished purchaser liability for pre-sale employment discrimination claims made against the debtor and based on the debtor's pre-sale conduct)*; Leckie,* 99 F.3d at 580-81 (§ 363(f) extinguished "the debtors' liability for Coal Act premiums [arising] from their pre-petition, rather than their post-petition acts," such that the purchaser operating the mine could not be liable for the debtor's unpaid future obligations); *In re Old Carco,* 538 B.R. at 687 (§ 363(f) extinguished pre-sale liability for unemployment insurance taxes "result[ing] from the blameworthy behavior of [the debtor]"). *See generally In re USA United Fleet, Inc.,* 496. B.R. 79 (Bankr. E.D.N.Y. 2013).

after specific post-sale conduct by a purchaser. At the sale hearing, the Union expressed hope

that Braeburn would hire CCX's employees. (A227). But until Braeburn actually employed

essentially all of CCX's union-represented employees, Braeburn would have no obligation to

bargain with the Union. Second, CCX's motion to reject its CBA with the Union, pursuant to §

1113 (A232) resulted in a stipulation between the Union and CCX reflecting their agreement to

terminate the CBA and to resolve the various pre-sale claims—claims which arose under the

CBA prior to the May 27, 2022 closing of the sale to Braeburn. (A254). This stipulation made

clear that it did not impact any claims by the Union against Braeburn, stating it "shall only

address and resolve disputes involving the Debtor and the Union and Union Retirees." (A258).

Thus, while the agreement to terminate the CBA under § 1113 absolved CCX of certain

liabilities to the Union, it had no bearing on any liability Braeburn might incur based on its post-

sale conduct.

**D.      Appellee's Remaining Arguments Are Unavailing**

### 1.      The Bankruptcy Court's Jurisdiction to Interpret its Sale Order

Braeburn argues, "it is axiomatic that a court possesses inherent authority to enforce its

own orders." (*See* D.I. 14 at 20). While Braeburn's motion purportedly sought interpretation

and enforcement of the Sale Order, the Union's appeal of the Enforcement Order raises an issue

of law: whether a bankruptcy court order, approving the sale of a debtor's assets pursuant to the

free and clear of any "interests in [] property" pursuant to § 363(f), may enjoin a union from

pursuing relief for any future violations of the NLRA based on the purchaser's post-sale conduct.

Braeburn cites no decision holding that a § 363(f) sale order may insulate an entity from

NLRA obligations arising post-sale, or violations of the NLRA resulting from post-sale conduct.

Rather, courts and the NLRB have rejected this proposition. For example, in *Erica Inc.*, a

bankruptcy court entered a sale order with language very similar to the language at issue in this

proceeding. *Erica, Inc*, 344 NLRB at 800. In that case, a union represented employees of a supermarket chain which filed for bankruptcy protection. The supermarket entered an agreement with purchaser Fleming for the purchase of essentially all of the supermarket's assets, and the sale was approved by the bankruptcy court. *Id.* at 800. The sale order in that case provided that the transfer of assets "will not subject [Fleming or designated third parties] to any liability by reason of such transfer ..., including without limitation any theory of . . . successorship or transferee liability, labor law ...." *Id.* Subsequently, Erica, Inc. purchased the supermarket locations from Fleming. When Erica assumed ownership of the stores, it resumed normal operations, and hired many of the former employees, but refused to recognize and bargain with the union. The union sought relief, and the NLRB concluded that the sale order did not shield Erica from liability for its failure to recognize and bargain with the union, reasoning that "the present case centers on [Erica]'s bargaining obligation under the [NLRA] after it acquired assets owned by Fleming." *Id.* at 801. Erica appealed, and the Fifth Circuit enforced the NLRB's determination. *Erica Inc. v. NLRB*, 200 Fed. App'x 344, 347 (5th Cir. 2006). It held that "[a] Bankruptcy Court order might discharge duties that arose before the bankruptcy petition, but a successor's post-sale conduct can create a new duty to bargain. As a result, the Bankruptcy Court's [sale] order here does not shield [the purchaser] from the NLRA's requirements." *Id.* "Because [purchaser]'s post-sale conduct meets the test for successor liability, [purchaser] acquired the obligation to bargain with the union of its predecessor." *Id.*

The First Circuit's *In re Carib-Inn* decision is also instructive. In that case, debtor Carib-Inn operated a hotel where a union represented employees. *In re Carib-Inn*, 905 F.2d at 563. The bankruptcy court approved a sale to purchaser Horizons, which began operating the hotel but refused to recognize and bargain with the union. *Id.* at 562-63. The NLRB issued a complaint, and Horizons asked the bankruptcy court to enjoin prosecution of the alleged unfair

labor practices. *Id.* at 561. The request was dismissed for lack of jurisdiction, and Horizons appealed to the First Circuit. *Id.* The First Circuit affirmed the dismissal, stating that "The NLRB has exclusive jurisdiction to determine the merits of an unfair labor practice complaint under 29 U.S.C. § 160." *Id.* Because the NLRB's complaint was "directed solely at Horizons and seeks no remedy against the bankrupt estate," it would be improper to enjoin the agency. *Id.* The First Circuit further observed that "the proposition that an order of the bankruptcy court could protect the purchaser from the consequences [of its alleged agent's conduct] under the National Labor Relations Act would be untenable." *Id.* at 564.

A district court reached a similar conclusion in *Overstreet v. Apex Linen Holdings, LLC*, 618 F. Supp. 3d 1014 (D. Nev. 2022).[7] The debtor ("Apex LLC") was bound by a CBA with a union. *Id.* at 1023. Apex LLC sold its operation to purchaser ("Apex Holdings"), and the bankruptcy court approved a purchase agreement that provided:

> [T]he transfer of the Assets . . . shall not result in [Apex Holdings] . . . having any liability or responsibility (i) for any Interest, or any other obligation of or against [Apex LLC] and [Apex Holdings shall not] as a result of the Sale or any action taken in connection with the Sale, be deemed to (a) be a successor (or other similarly situated party to [Apex LLC] . . .

*Id.* at 1027. As in this case, the NLRB alleged that Apex Holdings was a "perfectly clear" successor obligated to bargain with the union before altering the terms and conditions of employment set forth in the union's CBA with the predecessor. *Id.* at 1029-30 & n.7.

---

[7]     The procedural posture of the *Apex Holdings* case was different from the instant matter, as that case involved a request for interim injunctive relief against the successor employer pursuant to 29 U.S.C. § 160(j). Accordingly, the district court was obligated to examine evidence of the successor's unfair labor practices to determine whether the NLRB demonstrated a "likelihood of success on the merits." *See Apex Holdings*, 618 F. Supp. 3d at 1024. Because no such injunctive relief is sought here, no evaluation of the merits of the NLRB's allegations against Braeburn is required.

The district court rejected Apex Holding's contention that the sale order immunized it from successor status under the NLRA. *Id.* at 1027-28. "Congress has entrusted the Board, not the bankruptcy court, with the authority to determine whether an unfair labor practice has occurred ... Whether a business is a successor 'normally falls within the [NLRB]'s primary jurisdiction.'" *Id.* at 1027 (quoting *Erica Inc.*, 344 NLRB at 801). The court observed that the successorship inquiry in the "labor-law context is much broader than the strict corporate-law sense of successorship.'" *Id.* (quoting *Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1099 (9th Cir. 2015)). Agreeing with the Fifth Circuit, the *Apex* court noted that while a bankruptcy court's order "might discharge duties that arose before the bankruptcy petition," "a successor's post-sale conduct can create a new duty to bargain" under labor law. *Id.* (quoting *Erica Inc.*, 200 Fed. App'x at 347). The *Apex* court ultimately concluded that the sale order at issue there "does not preclude a post-sale finding by the [NLRB] that Apex Holdings is a successor." *Id.*

Braeburn argues that the Union's reliance on this case is misplaced because the purchaser in that case did not assert Braeburn's specific argument here—"that § 363(f) precludes successor liability." (D.I. 14 at 32). In both cases, however, "the factors that govern successorship under labor law did not materialize until after the sale was complete and [the purchaser] took over the business." *See id.* at 1027-28. "Only then could it be determined whether there was a substantial continuity of the same business operations and use of the same plant workers, jobs, machinery, supervisors, and service." *Id.* at 1028. Likewise, as the *Apex* court observed, "the question of whether a majority of Apex Holdings' bargaining unit employees previously worked for Apex LLC could not be determined until after the sale was completed and Apex Holdings made its hiring decisions." *Id.* Thus while the purchaser in *Apex* did not rely on § 363(f), the court's decision is consistent with the general principle that, notwithstanding a bankruptcy court's

authority pursuant to § 363(f) to extinguish liabilities incurred prior to the sale of the debtor's assets, the court cannot insulate a purchaser from liability for claims that arose after the sale due to the purchaser's own conduct.

### 2.    CCX's Rejection of the CBA Is Not Relevant to this Appeal

Braeburn stresses that the Union entered into a stipulated settlement with the Debtor in which it "agreed that the CBA is deemed terminated effective May 27, 2022 and that such CBA has no further force or effect ..." (D.I. 14 at 8 (citing A245, at Exh. 1 ¶ 7)). Indeed, "the rehabilitative policy of the Bankruptcy Code has taken precedence over the labor policies in order to permit rejection of collective bargaining agreements." 3 Collier Bankruptcy Practice Guide ¶ 69.02 (2023). A debtor or trustee may reject a collective bargaining agreement in accordance with the specific requirements[8] of § 1113. *See* 11 U.S.C. § 1113(a). And when rejection under § 1113 is approved by a bankruptcy court, the NLRB is thereafter precluded from filing charges of unfair labor practices against the debtor or trustee for violating the provisions of the NLRA. *See id.* That said, "A bankruptcy court order approving the sale of the debtor's assets free and clear cannot shield the purchaser from successor liability arising out of its postsale conduct." 7 Collier Bankruptcy Practice Guide ¶ 133.10 (2023).

---

[8]    Pursuant to § 1113 of the Bankruptcy Code, a debtor or trustee seeking to reject a collective bargaining agreement must first: (i) make a proposal to the employees' authorized representative of the modifications necessary to permit the debtor's reorganization and assure that all creditors and affected parties are treated fairly and equitably; (ii) provide the representative with the information necessary to evaluate the proposal; and (iii) meet and confer with the representative in good faith in attempting to reach mutually satisfactory modifications of such agreement. *See* 11 U.S.C. § 1113(b). Rejection of the collective bargaining agreement may be approved only where: (i) the above criteria are fulfilled; (ii) the employees' authorized representative has refused to accept such proposal without good cause; and (iii) the balance of the equities clearly favors rejection of such agreement. *See* 11 U.S.C. § 1113(c).

The purchaser in *Apex*, like Braeburn in the instant case, also relied upon the debtor's rejection of its collective bargaining agreement with the union. *See Apex*, 618 F. Supp. 3d at 1027. As the *Apex* court recognized, "[t]he bankruptcy court's order allowing [the debtor] to reject the CBA has no bearing on the issue of whether [the purchaser] is a successor" as it "says nothing about [the purchaser's] obligations (or lack thereof) as a successor. It orders only that [the debtor] was authorized to reject the CBA." *Id.* Here, CCX's rejection of its CBA with the Union is arguably even less relevant, where the Bankruptcy Court approved a stipulation that the resolution of CCX's motion to reject the CBA "shall only address and resolve disputes *involving the Debtor and the Union and Union Retirees*." (A258 (emphasis added)).

### 3.    Braeburn's Policy Argument for a Bankruptcy Exception to the NLRA's Successor Bargaining Obligations Is Not Supported by Case Law

Braeburn posits various policy reasons why the Bankruptcy Court must be empowered to insulate a purchaser from successor bargaining obligations arising under the NLRA based on the purchaser's post-sale conduct. (*See* D.I. 14 at 25-36). Braeburn emphasizes the clean slate that § 363(f) can provide, which often is an essential inducement leading a buyer to purchase a debtor's assets, and which serves chapter 11's overarching goal of maximizing the value of the debtor's estate for the benefit of all stakeholders. The cases cited by Braeburn in support, however, are merely consistent with the aforementioned principle that, notwithstanding a bankruptcy court's authority pursuant to § 363(f) to extinguish liabilities incurred prior to the sale of the debtor's assets, it cannot insulate a purchaser from liability for claims that arose after the sale due to the purchaser's own conduct. (*See id.* at 25-26, citing *In re Ormet Corp.*, 2014 WL 3542133, at *4 (Bankr. D. Del. July 17, 2014) (approving § 363 sale of manufacturing facility to purchaser free and clear of Steelworkers Pension Trust's asserted successor liability claim, which was based on debtor's pre-sale underfunding of its pension plan); *In re Trans World Airlines*, 322 F.3d at 290-

91 (§ 363(f) extinguished purchaser liability for pre-sale employment discrimination claims made against the debtor and based on the debtor's pre-sale conduct); *In re NE Opco, Inc.,* 513 B.R. 871, 877-78 (Bankr. D. Del. 2014) (purchaser could not use bankruptcy "free and clear" sale order to escape liability for employment discrimination claims that were based on purchaser's post-sale refusal to hire); *Leckie*, 99 F.3d at 578 (§ 363(f) extinguished "the debtors' liability for Coal Act premiums [arising] from their pre-petition, rather than their post-petition acts," such that the purchaser operating the mine could not be liable for the debtor's unpaid future obligations); *PBBBC*, 484 B.R. at 869 (noting that the purchaser would not have bought assets if not sold free and clear of "employer's contribution rate" for unemployment taxes, which was an "interest in [] property" subject to § 363(f) because it "is really an attempt to recover the money that the predecessor employer would have paid if it had continued in business"))).

Cases specifically addressing the successorship rule developed by the NLRB, on the other hand, underscore the important policies that rule serves. *See Fall River Dyeing*, 482 U.S. at 38-39 (observing that the benefit of the successorship rule developed by the NLRB is "to permit unions to develop stable bargaining relationships with employers, which will enable the unions to pursue the goals of their members, and this pursuit, in turn, will further industrial peace"). Absent the NLRB's successorship approach, "with the wide variety of corporate transformations possible, an employer could use a successor enterprise as a way of getting rid of a labor contract." *Id.* at 40. The Court agrees that permitting a "bankruptcy loophole" in the NLRB's successorship regime will encourage strategic use of the bankruptcy process to avoid union obligations. And because the Bankruptcy Code and the NLRA are "capable of coexistence," the Court will not read one to override the other. *See Morton v. Mancari,* 417 U.S. 535, 551 (1974).

## IV.    CONCLUSION

The Enforcement Order must be reversed to the extent that it enjoins the Union from

seeking relief under the NLRA based on Braeburn's post-sale conduct.  A separate order follows.